**Dorothy GOOSBY, Samuel Prioleau, Xavier Morales, and Miladys Morales, Plaintiffs,**

v.

**TOWN BOARD OF THE TOWN OF HEMPSTEAD, NEW YORK, Gregory P. Peterson, Richard A. Zagarino, Curtis Fisher, Joseph Ra, Anthony Santino, Joseph Kearney, in their official capacities as members of the Town Board of the Town of Hempstead, Nassau County Board of Elections, John DeGrace and Steven Sabbeth, in their official capacities as Commissioners of Elections of Nassau County, Defendants.**

No. 88 CV 2453 (JG).

United States District Court, E.D. New York.

· Feb. 20, 1997.

**328**

Frederick K. Brewington, Hempstead, NY, Randolph M. Scott–McLaughlin, Center for Constitutional Rights, New York City, for Plaintiffs.

Joseph J. Ortego, Evan H. Krinick, Kenneth A. Novikoff, Rivkin, Radler & Kremer, Uniondale, NY, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GLEESON, District Judge:

This is an action brought under Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, and the First, Thirteenth, and Fourteenth Amendments to the United States Constitution. Plaintiffs, African–American [1] citizens of the Town of Hempstead (the "Town"), challenge the at-large voting practice used in the Town to elect the six Councilmembers who sit on the Town Board of the Town of Hempstead (the "Town Board"). Plaintiffs contend that this system dilutes the voting strength of the minority population in the Town in violation of the Voting Rights Act, and seek an order directing the implementation of a single-member district election system.

---

1. The terms "African–American" and "black" were used interchangeably by both parties throughout the trial, as they are here. Although there is a small percentage of the population of the Town of Hempstead that is Hispanic black, both sides agree that it is not large enough to significantly affect the relevant statistics in this case. Claims on behalf of a subclass of Hispanic citizens have been withdrawn.

The complaint was filed on August 8, 1988. On November 16, 1994, the case was reassigned to this Court. Discovery was completed in February 1996. Defendants moved for summary judgment, which motion was argued and denied on April 5, 1996. A three-week bench trial was held in July 1996, and closing arguments by counsel were heard on August 14, 1996.

This decision is arranged in three parts. Part I sets forth a brief overview of the legal principles governing claims under Section 2 of the Voting Rights Act. Part II sets forth my findings of fact. Part III sets forth my conclusions of law.

I conclude that plaintiffs have established a violation of Section 2 and are entitled to the relief they seek.

## I. OVERVIEW OF THE LEGAL PRINCIPLES GOVERNING CLAIMS UNDER SECTION 2 OF THE VOTING RIGHTS ACT

Section 2 of the Voting Rights Act of 1965, as amended, reads in pertinent part as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color. . . .

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973 (1994). There is no dispute that the at-large system for electing the members of the Town Board is an electoral practice that is subject to challenge under Section 2. In addition, it is clear that the 1982 amendments to Section 2 rejected the plurality opinion in *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), which sought to impose on Section 2 plaintiffs an obligation to prove that the challenged practice was adopted or maintained with the intent to discriminate against minority voters. *Thornburg v. Gingles,* 478 U.S. 30, 43–44, 106 S.Ct. 2752, 2762–63, 92 L.Ed.2d 25 (1986).

In *Gingles,* the Supreme Court identified three "preconditions" to a successful challenge to multimember districts under Section 2: (1) the minority group must be sufficiently large and geographically compact to constitute a majority in a single-member district; (2) it must be politically cohesive; and (3) the white majority must vote sufficiently as a bloc to enable it, in the absence of special circumstances, to defeat the minority's preferred candidate. 478 U.S. at 50–51, 106 S.Ct. at 2766–67. "Regarding the third prong, *Gingles* instructed that 'in general, a white bloc vote that normally will defeat the combined strength of minority support plus white "crossover" votes rises to the level of legally significant white bloc voting.'" *NAACP v. City of Niagara Falls,* 65 F.3d 1002, 1007 (2d Cir.1995) (quoting *Gingles,* 478 U.S. at 56, 106 S.Ct. at 2769).

The satisfaction of these three preconditions, which have come to be known as the "*Gingles* factors," is necessary but not sufficient to prove a Section 2 violation. More is required; if the preconditions are met, a district court must then consider whether, under the totality of the circumstances, the challenged practice impairs the ability of the minority voters to participate equally in the political process. *City of Niagara Falls,* 65 F.3d at 1007 (citing *Gingles,* 478 U.S. at 80, 106 S.Ct. at 2781–82). Thus, proof of the *Gingles* preconditions does not always por-

tend liability under Section 2, *Johnson v. De Grandy*, 512 U.S. 997, 1012 n. 10, 114 S.Ct. 2647, 2657 n. 10, 129 L.Ed.2d 775 (1994), but "it will only be the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." *City of Niagara Falls*, 65 F.3d at 1019 n. 21 (citing *Jenkins v. Red Clay Consolidated School Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir.1993), *cert. denied*, 512 U.S. 1252, 114 S.Ct. 2779, 129 L.Ed.2d 891 (1994)); *Teague v. Attala County*, 92 F.3d 283, 293 (5th Cir. 1996); *Clark v. Calhoun County*, 21 F.3d 92, 97 (5th Cir.1994); *see also Johnson v. De Grandy*, 512 U.S. at 1012 n. 10, 114 S.Ct. at 2657 n. 10 (noting that § 2 challenges to multimember districts are likely to be easier plaintiffs' cases than challenges to electoral practices in single-member districts).

In assessing the totality of the circumstances in which a challenged electoral practice is employed, a district judge must conduct a "searching practical evaluation of the 'past and present reality.'" *Gingles*, 478 U.S. at 45, 106 S.Ct. at 2764 (quoting S.Rep. No. 417, 97th Cong., 2d Sess. (1982) ("Senate Report") at 30, *reprinted in* 1982 U.S.Code Cong. & Admin.News ("U.S.C.C.A.N.") 177, at 208). This requires a fact-intensive, functional view of the political process, in an effort to determine whether the Town's political processes are equally open to participation by its black citizens. *Id.* at 45–46, 106 S.Ct. at 2763–64.

*Gingles* identified as relevant to this inquiry the factors set forth in the Senate Report (which accompanied the 1982 amendments to Section 2), which are as follows:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction;

8. whether there is significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

9. whether the policy underlying the state or political subdivision's use of the challenged voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*See* Senate Report at 28–29, 1982 U.S.C.C.A.N. 206–07, *cited in Gingles*, 478 U.S. at 36–37, 44–45, 106 S.Ct. at 2758–59, 2762–64; *see also City of Niagara Falls*, 65 F.3d at 1007–08.

The factors set forth in the Senate Report are not exclusive,[2] and are not to be applied mechanically. A failure by plaintiffs to establish a particular factor "is not rebuttal evidence of non-dilution." Senate Report at 29 n. 118, 1982 U.S.C.C.A.N. at 207. Nor

---

2. Another factor relevant to this broad-based inquiry is the extent to which minority-preferred candidates have been rejected by white voters for reasons other than those which made the candidate the preferred choice of the minority group.

In this case, for example, defendants claim that partisan politics, not racial considerations, accounts for the political famine plaintiffs seek to remedy. *See* Part *III, infra.*

should the outcomes of these factors be tallied, as though a majority of them, or particular ones among them, must weigh in plaintiffs' favor before a Section 2 violation is established. *Id.* Rather, these factors are simply guideposts in a broad-based inquiry in which district judges are expected to roll up their sleeves and examine all aspects of the past and present political environment in which the challenged electoral practice is used, "because 'ultimate conclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts.'" *City of Niagara Falls,* 65 F.3d at 1008 (quoting *De Grandy,* 512 U.S. at 1011, 114 S.Ct. at 2657).

## II. FINDINGS OF FACT

### A. *The Town Of Hempstead And Its Characteristics*

The Town of Hempstead is the most populous town in the United States. Measured by population, it is larger than all but 13 cities in the United States, and is larger than six states. It is 25% larger than New York's third and fourth congressional districts, which both include substantial portions of the Town as well as surrounding areas. The Town is apparently among the largest undivided election districts in the country. According to the United States Census, the total population in the Town is 725,639 (as of 1990), of which 12.1% are black and 83% are white. The voting age population is 11.2% black and 84.8% white. Of this voting age population, 48.6% are registered Republicans, 29.6% are registered Democrats, and 21.8% are either unregistered or are registered as something other than Republican or Democrat.

Since 1960, the black population has grown steadily from 3.4% of the total population to 5.8% (1970) to 9.3% (1980) to the 1990 level of 12.1%. As of 1990, the black population in the Town was 87,644, and there is ample reason to conclude that it has continued to grow as a percentage of the total population during the past seven years.

The Town of Hempstead is located in Nassau County. The Town includes twenty-two villages and thirty-four unincorporated areas. The county, the Town, and the villages each have their own local governments. The responsibilities of these governments are in some respects distinct. Who fixes a damaged road, for example, depends on whether it is a state road, a county road, a town road or a village road. In other respects, the responsibilities of these levels of government overlap.

The Town is governed by a Town Board, a legislative body that is required under New York Town Law to have a Supervisor and at least four Town Councilmembers. The number of Council seats may be increased to six by a referendum vote of the Town residents. Prior to 1967, the Town Board consisted of a Supervisor, a Presiding Supervisor and four Town Councilmembers. In 1967, the number of Councilmembers was increased by referendum to six. Since that time, the six Councilmembers have been elected in staggered four-year terms. Every two years, in the odd-numbered years, three Councilmembers are elected at-large. Each eligible voter in the Town is able to cast three votes, one for each vacant seat on the Board. "Single-shot" voting (voting for only one candidate) is permitted, and cumulative voting (casting multiple votes for one candidate) is prohibited. The three candidates who obtain the most votes win the three seats on the Board; there is no requirement that a candidate receive a majority vote to win a seat. This system is used in every town on Long Island and in all but approximately ten of the 900 towns in New York State. A referendum to change the electoral system in the Town of Hempstead from an at-large to a councilmanic district system was rejected in 1967 by the Town residents.

From 1967 until January 1996, the Town Board also included a Supervisor and a Presiding Supervisor, both of whom sat on the six-member Nassau County Board of Supervisors. After a successful challenge to the constitutionality of that body, *see Jackson v. Board of Supervisors,* 818 F.Supp. 509 (E.D.N.Y.1993), and as a result of a county-wide vote and state legislation, the Board of Supervisors was replaced with a nineteen-member county legislature in 1994. The

Presiding Supervisor position was eliminated in 1996. Thus, the Town Board now consists of six Councilmembers, who are part-time Town employees earning $45,000 per year, and the Town Supervisor, a full-time employee who is the chief executive and administrative officer of the Town and a voting member of the Town Board.[3]

Throughout the trial of this case, defendants have asserted that the Town Board has only a limited governmental function. They correctly point out that Town residents are affected by a complex web of governments—state, county, town and village. Nonetheless, the evidence establishes that the Town Board exercises substantial authority, both formally and informally, in a wide variety of areas of importance to its residents.

The formal powers and responsibilities of the Town Board include controlling Town finances, acquiring and selling real property, maintaining Town property (including its various parks), filling vacancies in Town offices, removing fire and health hazards, awarding and executing Town contracts, cleaning and repairing Town streets and roads, maintaining adequate lighting on Town roads, collecting garbage in certain areas of the Town,[4] and promulgating zoning laws and hearing applications for rezoning areas of the Town. The Town has numerous departments, including the Public Safety Department, the Department of Sanitation, the Department of Water, the Department of Parks and Recreation, the Department of Senior Enrichment, the Department of Planning and Economic Development, the Department of General Services, the Department of Highways, the Department of Industry and Commerce, the Department of Conservation and Waterways, the Department of Occupational Resources, and the Department of Buildings. The Board appoints the members of the Board of Zoning Appeals, and hears appeals from its denials of zoning variances. The current Town budget is $290 million, and there are approximately 2500 Town employees.

The formal authority of the Town Board is supplemented by the political influence its members wield. For example, there is no Town Police Department (the Public Safety Department's 60 "safety officers" are not peace officers), but a Councilmember need only pick up the telephone in order to influence the actions of the Nassau County Police Department. Similarly, the Town Board has the power to pass resolutions that can influence other governing bodies. In these and other ways, Town Councilmembers exercise considerable influence over the operations of the other governmental entities that affect the Town's residents.

The main political parties in the Town are the Republican Party and the Democratic Party. Other political parties that have fielded candidates include the Conservative Party, the Liberal Party and the Right to Life Party.

The Republican Party has had a lock on Town-wide elections since the inception of Town government. Indeed, since 1907, the victor of every Town-wide election (Presiding Supervisor, Supervisor, Councilmember, and Town Clerk)—71 elected officials in all—has been a Republican. With the exception of Curtis Fisher, who was elected in 1993, all have been white.

B. *The First Gingles Precondition: A Sufficiently Large And Geographically Compact Minority Group*

Dr. Andrew Beveridge, an expert in the field of districting, created a map establishing six single-member districts in the Town. He followed four principles in creating the six districts depicted in Plaintiffs' Exhibit ("PX") 4D, which is appended to this decision at A–1: (1) each district should have as close

---

3. Although the Town Supervisor is also elected at-large, that practice is not challenged here. *See Butts v. City of New York,* 779 F.2d 141 (2d Cir.1985), *cert. denied,* 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986) (Section 2 does not apply to single-member offices).

4. Responsibility for garbage removal is divided among (a) the Town Board, which through its Department of Sanitation handles the eastern part of the Town; (b) five special sanitation districts established by the New York State legislature to collect garbage in unincorporated areas in the western part; and (c) sanitation districts established by some of the incorporated villages.

to an equal number of residents as possible, with a maximum variance of 5%; (2) the boundaries of each district should conform, to the extent possible, to the existing political geography; (3) the districts should be reasonably compact; and (4) to the extent possible, where the first three criteria have been met, the black population should be included in one district. Dr. Beveridge thereby proposed a hypothetical black-majority district without subordinating traditional districting principles to race.

For Census purposes, areas within the Town are designated either villages, Census Designated Places ("CDPs") or unincorporated areas. A CDP is an unincorporated area that is considered a community. There are approximately 10,000 Census blocks and 747 block groups in the Town, from which Dr. Beveridge was able to measure racial composition and draw the six proposed districts, each of which has close to 120,000 people. The largest district is only 1.67% over 120,-000, and the smallest, District 3, was only 2.53% less than 120,000.

District 3 is a majority-minority district. Its boundaries follow village and CDP boundaries except in two places: it cuts through the village of Freeport and through the West Hempstead CDP. Where it cuts through Freeport, it crosses south of Sunrise Highway and takes in additional areas with minority residents.[5] The proposed District 3 is very similar to Assembly District 18—a majority-minority district for election of a member of the New York State Assembly. A comparison of District 3 and Assembly District 18 is depicted in Plaintiffs' Exhibit 4F, a copy of which is appended at A–2. District 3 includes all four of the predominantly black communities in the Town: Lakeview, Roosevelt, Freeport and Hempstead. The total population of District 3 is 55.45% black; the voting age population is 52.57% black. The proportions of blacks and whites in District 3 are within tenths of a percentage point of their proportions in Assembly District 18.

There are some communities that Dr. Beveridge split in his proposed map that might naturally be expected to be included in the same district. For example, Hewlitt, one of the five areas that make up a community known as the "Five Towns" (the other four are Inwood, Lawrence, Cedarhurst, and Woodmere) is not in the same proposed district as the other four. Also, Lido Beach is closest to District 4 but is included in District 6. Dr. Beveridge also split what is known as the "tri-community" of Malverne, Lakeview, and Lynbrook, including only Lakeview in District 3.

Nonetheless, the proposed districts are compact. Dr. Beveridge measured compactness by dispersion in the district, which is calculated by the ratio of the area of the actual district to the area of the ideal district, where the ideal district is a circle the radius of which is the line from the center of the district to the farthest point in the actual district. The most compact district would thus have a dispersion measurement of one. The average compactness for the districts Dr. Beveridge created was .44, and the compactness for proposed District 3 was .38. District 3 was thus more dispersed than the average dispersion of all six districts. However, in 1990 the average compactness for United States Congressional districts was .36, and the average compactness for New York Congressional districts was .30. Moreover, the compactness for New York State Assembly District 18 (the majority-minority district) is .29.

Dr. Beveridge also measured the compactness of his proposed districts by dividing the perimeter of the ideal district by the perimeter of the actual district. Again, the perfectly compact district has a perimeter ratio of one. Proposed District 3 has a perimeter ratio of .27, which compares favorably with the average perimeter ratios of the majority-minority Assembly District 18 (.26) and the U.S. Congressional districts as measured in 1990 (.24), and it exceeds the 1990 average perimeter ratio of New York Congressional districts (.20).

---

5. The only other area in the Town that is split between Dr. Beveridge's proposed districts is the North Bellmore CDP, which is split between Districts 5 and 6. District 2 contains only part of two villages, Floral Park and New Hyde Park, but that is because those villages' borders extend beyond the borders of the Town itself.

The compactness of District 3 is further demonstrated the old-fashioned way—by looking at a map. The black population in the Town is clearly confined, in large measure, to a geographic block in its center. Plaintiff's Exhibit 4D, appended at A–1, depicts this visually. In fact, the black population is even more compact than the map suggests, as the northern end of District 3, though shaded in its entirety, includes Eisenhower Park, in which very few people reside.

### C. The Second Gingles Precondition: Political Cohesion Of The Minority Group

There is no dispute that the black voters in the Town are politically cohesive. Although defendants have challenged the ability of plaintiffs' proposed District 3 to perform by electing a minority-preferred candidate, they agree that the black voters consistently vote cohesively for the Democratic candidates, who always lose the Town Board elections.

Plaintiffs' expert, Dr. Michael D. McDonald, conducted a "performance analysis" to determine whether, given turnout rates and the degree of racially polarized voting, one could reasonably expect that a candidate preferred by black voters could win in a single-member district system. Dr. McDonald concluded that based on the level of black support for the minority-preferred candidate, estimated using a double regression analysis [6] of the election districts in the 18th Assembly District ("A.D."), blacks would have been able to elect their preferred candidate had they been voting in a single-member district with a voting age population that was 47.8% black in the 1991 Town Council election, 44.6% black in the 1993 Town Council regular election, and 34.2% black in the 1993 Town Council special election.

It can be expected, and I find, that blacks in proposed District 3 would be able to elect their preferred candidate.

### D. The Third Gingles Precondition: White Bloc Voting

Both plaintiffs and defendants presented expert testimony at trial regarding the voting patterns among blacks and whites in the Town. Plaintiffs expert, Dr. McDonald, analyzed Town Board elections from 1983 to 1993.[7] The first stage of his analysis was a comparison of the percentages of the vote each candidate received in the Town-wide election with the percentages received from voters residing in the 18th A.D., the majority-black district for election to the New York State Assembly. From this analysis, Dr. McDonald drew the preliminary conclusion that the black-preferred candidates would have fared better than they did in the Town-wide elections if the Town Council elections had been held in a majority-black district. Indeed, in the regular elections in 1991 and 1993 and in the special election in 1993, all but one of the seven winning candidates would have been different had the election been held within the 18th A.D.[8]

---

**6.** The statistical methods used to predict support for candidates by voters of different races are explained in subsequent sections.

**7.** Dr. McDonald also analyzed elections other than Town Board elections to determine whether there was a pattern of racially polarized voting. He analyzed two other town-wide elections involving black candidates (the 1985 Town Clerk election and the 1993 Town Receiver of Taxes election). He also analyzed five elections (from 1984 to 1992) in the 18th Assembly District and four judicial elections involving black candidates: three for the state District Court (in 1990, 1991, and 1993) and one for the state Supreme Court (in 1992). Finally, Dr. McDonald analyzed four primary elections—the 1984 and 1988 Democratic presidential primaries, the 1992 Democratic primary for the United States Senate, and the 1992 Republican primary for the 18th Assembly District. He found that these elections exhibited racial polarization. However, because his findings of racial polarization in the Town Council elections are sufficiently supported and are essentially undisputed by the defendants, these additional elections are not discussed in depth.

**8.** Dr. McDonald found the following results:

*1991 Town Council (3 candidates elected)* *

| Candidate | Town-wide Vote | 18th A.D. Vote |
|---|---|---|
| Cairo (R,W) | 48.9% | 36.6% |
| Cullin (R,W) | 48.0% | 39.0% |
| Zagarino (R,W) | 47.7% | 36.2% |
| Kalastein (D,W) | 35.9% | 39.8% |
| Grabinger (D,W) | 35.2% | 38.8% |
| **Ford (D,B)** | **34.3%** | **43.2%** |

However, this analysis is not alone sufficient to determine whether there is a pattern of racially polarized voting in the Town of Hempstead, because it does not measure the degree of difference in support for certain candidates among whites and blacks.

Dr. McDonald thus conducted a further analysis to estimate these levels of support for each candidate. He used methods of statistical analysis called "ecological correlation and regression analysis" (or "ecological regression") and "extreme case analysis." Both methodologies are designed to measure the strength of the relationship between changes in two variables. Ecological regression and extreme case analysis are standard techniques used to estimate voting behavior among distinct population groups. *Gingles,* 478 U.S. at 52–53, 106 S.Ct. at 2767–68.

Extreme case analysis predicts the percentage of voter support for certain candidates among the racial groups by using the support given to the candidates in geographic areas where the voting population is racially homogeneous, which was defined in this case as more than 90% white or more than 90% black. Ecological regression analysis correlates the percentage of voters who voted for a particular candidate with the percentage of blacks in the voting age population in a particular geographic area.

Because both extreme case analysis and ecological regression analysis provide only estimates and are subject to error, Dr. McDonald performed both among voters of various areas to determine whether they produced consistent estimates of the racial groups' support for each candidate. Dr. McDonald performed four analyses to measure white voting: (1) an extreme case analysis of the seven A.D.s (or parts thereof) within the Town that are over 90% white;[9] (2) an extreme case analysis of the eight election districts within the 18th A.D. that are over 90% white; (3) a simple regression analysis using results from all election districts within the 18th A.D.; and (4) a double regression analysis using results from all election districts within the 18th A.D. To measure black voting, Dr. McDonald did three analyses: (1) an extreme case analysis of the seven election districts within the 18th A.D. that are over 90% black; (2) a simple regression analysis using the results from all election districts within the 18th A.D.; and (3) a double regression analysis using results from all election districts within the 18th A.D.

In his ecological regression analysis, Dr. McDonald measured the relationship between the racial composition of the Town's A.D.s and election districts and the level of support given to particular candidates within those units in elections from 1983 to 1993. He placed the independent variable (the percentage of black or white registered voters in an election district within the 18th A.D.) on the horizontal axis. Dr. McDonald then placed the dependent variable (the percentage of voters in a particular A.D. who voted for a particular candidate) on the vertical axis. He then plotted data points on the graph that represented the percentage of black or white voters in each A.D. who supported a particular candidate. Finally, Dr. McDonald drew a line through the data

*1993 Town Council (3 candidates elected)*

| Candidate | Town-wide Vote | 18th A.D. Vote |
|---|---|---|
| **Fisher (R,B)** | 49.0% | 38.7% |
| Kearney (R,W) | 48.3% | 32.8% |
| Santino (R,W) | 48.2% | 32.2% |
| Davidson (D,W) | 33.5% | 41.9% |
| DeJong (D,W) | 33.1% | 42.2% |
| Dorsky (D,W) | 32.9% | 41.5% |

*1993 Town Council Special Election (1 candidate elected)*

| Candidate | Town-wide Vote | 18th A.D. Vote |
|---|---|---|
| Blakeman (R,W) | 59.4% | 41.6% |
| **DeFreitas (D,B)** | **39.4%** | **57.2%** |

\* Only the votes for the top six candidates are reported here. The remaining candidates received less than 5 of the votes cast.

\*\* The first letter following each candidate's name denotes his or her party affiliation; the second denotes race. The black candidates' names and results are in bold type.

9. The Town includes all or part of eight Assembly Districts, seven of which are extreme case white (none have more than 7% black voting age population). The eighth is of course the 18th A.D., which has just over 50% black voting age population. There are no extreme case black Assembly Districts.

points which best fit the points on the graph, or the line from which there would be the least variance from each data point. The slope of this line represents the increase (or decrease) in support for a particular candidate when the racial composition of a geographic area changes. By extending the line through the vertical axes on the left and right of the graph, Dr. McDonald estimated the level of white and black voter support for a particular candidate.

Dr. McDonald's ecological regression analysis consisted of both a simple regression and a double regression. The simple regression measured the percentage of white and black voters of the total voting age population who supported a particular candidate. The double regression measured the percentage of support among voters who actually voted. Both analyses of white and black voter support for certain candidates were based on the support in each election district within the 18th A.D. However, Dr. McDonald chose to use the double regression results since they were a more accurate measurement of voter support in each race.

Dr. McDonald computed these figures by considering the percentage of voters in each election district within the 18th A.D. who voted for a candidate and the percentage of voters in each election district who did not vote for that candidate. He then added these figures to determine the percentage of voters in each election district who actually voted in that election. With these figures, he was able to estimate the support for particular candidates in each election district from the voters who actually voted in that election, rather than the support for each candidate as a percentage of the total voting age population in the election district. Thus, this method took account of any differences in the turnout rate between blacks and whites.

Dr. McDonald was then able to compare the white voter support with the black voter support. He made the following findings: [10]

*1983 Town Council (3 candidates elected)* [11]

| Candidate | Whites | Blacks |
|---|---|---|
| Mondello (R,W) | 60.6% | 25.1% |
| Peterson (R,W) | 60.0% | 26.1% |
| Cairo (R,W) | 59.6% | 22.8% |
| Bernstein (D,W) | 28.2% | 52.8% |
| **Lawrence (D,B)** | **26.5%** | **53.2%** |
| Reddan (D,W) | 25.7% | 49.5% |

*1985 Town Council (3 candidates elected)*

| Candidate | Whites | Blacks |
|---|---|---|
| Gaurdino (R,W) | 60.0% | 29.1% |
| Bernstein (R,W) | 58.7% | 28.9% |
| Weisbein (R,W) | 57.9% | 26.0% |
| **Lawrence (D,B)** | **26.4%** | **44.9%** |
| Magaliff (D,W) | 25.8% | 43.3% |
| Guise (D,W) | 25.6% | 43.3% |

*1987 Town Council (3 candidates elected)*

| Candidate | Whites | Blacks |
|---|---|---|
| Cairo (R,W) | 61.7% | 27.3% |
| Zagarino (R,W) | 61.0% | 23.4% |
| Cullin (R,W) | 59.6% | 26.1% |
| Davidson (D,W) | 25.3% | 45.4% |
| **Brewington (D,B)** | **24.0%** | **57.8%** |
| DelMastro (D,W) | 24.7% | 43.0% |

*1989 Town Council (3 candidates elected)*

| Candidate | Whites | Blacks |
|---|---|---|
| Levy (R,W) | 54.4% | 25.3% |
| Guardino (R,W) | 53.5% | 25.2% |
| Kearney (R,W) | 53.0% | 23.3% |
| DelMastro (D,W) | 33.1% | 49.5% |
| Labelson (D,W) | 32.2% | 50.4% |
| **Mosely (D,B)** | **32.0%** | **53.9%** |

10. The findings listed here for white voter support are based on the extreme case analysis of the white A.D.s; the black voter support is based on the double regression analysis of the election districts in the 18th A.D. The other analyses performed by Dr. McDonald to estimate voter support among the different racial groups provided consistent results. Again, the letters following the candidates' names denote their party affiliation and race; black candidates' names are in bold type.

11. Only the election results from the top six candidates are reported. The remaining candidates received less than 5% of the votes cast.

*1991 Town Council (3 candidates elected)*

| Candidate | Whites | Blacks |
|---|---|---|
| Cairo (R,W) | 50.6% | 15.3% |
| Cullin (R,W) | 49.2% | 17.3% |
| Zagarino (R,W) | 49.3% | 15.0% |
| Kalastein (D,W) | 35.4% | 49.5% |
| Grabinger (D,W) | 34.7% | 51.5% |
| **Ford (D,B)** | 33.3% | 58.4% |

*1993 Town Council (3 candidates elected)*

| Candidate | Whites | Blacks |
|---|---|---|
| **Fisher (R,B)** | **50.1%** | **28.6%** |
| Kearney (R,W) | 50.1% | 15.4% |
| Santino (R,W) | 50.0% | 14.6% |
| Davidson (D,W) | 32.5% | 51.3% |
| DeJong (D,W) | 32.1% | 52.4% |
| Dorsky (D,W) | 32.0% | 51.2% |

*1993 Town Council Special Election (1 candidate elected)*

| Candidate | Whites | Blacks |
|---|---|---|
| Blakeman (R,W) | 61.3% | 20.8% |
| **DeFreitas (D,B)** | **37.6%** | **78.4%** |

Dr. McDonald concluded that each of these Town Board elections exhibited racially polarized voting. Indeed, all forms of analysis of the voting patterns consistently reveal a clear pattern of racially polarized voting. As a result, Dr. McDonald concluded, black voters have never been able to elect their preferred candidate to the office of Town Board Councilmember. Dr. McDonald further observed that:

> One cannot help but notice, of course, that the racial polarization apparent in these elections is associated with a form of partisan polarization. Black voters behave in a way indicating their preferred candidates are Democrats. In the face of the white majority's support for Republicans, black voters do not have much, if any, opportunity to elect candidates of their choice.

Defendants' expert, Dr. Harold W. Stanley, also analyzed Town Board elections from 1983 to 1993. In addition, Dr. Stanley analyzed the Town Supervisor and Presiding Supervisor elections from the same years. Like Dr. McDonald, Dr. Stanley used extreme case analysis and ecological regression analysis to determine the levels of white and black support for each candidate. However, Dr. Stanley used all of the election districts within the Town, rather than simply those within the 18th A.D., to conduct his analyses. As a result, he was able to use over 500 data points in his regression analysis, rather than just the 74 upon which Dr. McDonald relied. For his extreme case analysis, Dr. Stanley was able to use 9 extreme case black election districts and 342 extreme case white election districts.

Dr. Stanley found racial polarization similar to that found by Dr. McDonald in the Town Council races. While the racial polarization Dr. Stanley found was slightly less in some instances than that found by Dr. McDonald, the differences are not meaningful. Both sides agree that blacks and whites vote differently. Blacks support Democratic candidates. Whites support Republican candidates. Democratic candidates, whether white or black, have received similar levels of support from black voters.

Defendants have not seriously contested the existence of racial polarization in the voting patterns in the Town. Indeed, they argue that most elections are racially polarized, including every Presidential election since 1948 (with the exception of 1964). However, they contend that the racial polarization lacks legal significance because partisan politics, not racial bias, best explains the divergent voting patterns.[12]

E. *The Senate Report Factors*

1. *History Of Official Discrimination*

There has been no official policy of discrimination against blacks in the state or in the Town. Nor is there any basis to conclude that the Town's initial adoption of its at-large system, or its residents' 1967 decision to retain it, were motivated by racial animus. Plaintiffs contend, however, that the past use of a literacy test and a purging provision of the New York Election Law had a discriminatory impact on the ability of

---

**12.** *See* Part III, *infra.*

blacks to register to vote, remain registered to vote, and otherwise participate in the political process.

From 1922 to 1969, a literacy test was used in Nassau County. In order to register to vote, a citizen was required to present a certificate of literacy issued by the New York State Education Department. Plaintiffs contend that the retention of this test for four years after the enactment of the Voting Rights Act, coupled with the evidence that blacks in the Town are more likely than whites to be undereducated, constitutes historical discrimination cognizable under Section 2.

In fact, recent data suggest that blacks in the Town are significantly overrepresented at the low end of the education spectrum, and that a literacy test would almost certainly constitute a greater impediment to black voter registration than to white voter registration. Although defendants challenge the assertion that the same would be true in 1969, and correctly point out the absence in this case of socio-economic data from that period, I find the inference that the literacy test had a discriminatory impact on blacks to be a fair one. On the other hand, this adverse impact is blunted by the fact that blacks constituted a considerably smaller percentage of the Town population in 1969— less than 6%.

The purging of voters from the voting rolls of Nassau County was more recent and is more significant. Section 5–406 of the New York Election Law, enacted in 1949, required the purging of voters who had failed to vote for four successive years. Plaintiffs have demonstrated, through expert testimony based on both ecological regression and extreme case analysis, that the statute produced very substantial differences in the rates at which black and white voters were subject to this "non-voting purging." The purge rate was 56% greater in predominantly minority election districts than in predominantly white election districts. A black registrant in the 18th A.D. had a 70% greater chance of being purged for non-voting than did a randomly selected registrant from one of the remaining Assembly Districts in the Town. The number of purged voters was substantial; according to Allan J. Lichtman, whose affidavit was received in evidence by agreement, 25,786 voters in the Town were purged.

Defendants have not contested these facts, but instead have emphasized that the purge was conducted pursuant to state, rather than Town, legislation. They further contend that in 1990, when a judge in this district temporarily restrained the implementation of the purge provision because of its disparate impact on blacks, the Town Board voted to consent to further injunctive relief, and the purging ceased. Although I agree that these facts preclude a finding that the purging evidences discriminatory intent on the part of the Town Board, the undisputed discriminatory impact of the purging on black voters in the Town is an appropriate consideration in evaluating the totality of the circumstances.

Finally, plaintiffs offered testimony that blacks encountered racial hostility at the polls in the Town. Hazel N. Dukes, President of the New York State Conference of the NAACP and a member of its national board of directors, testified to her personal observations at two polling places in the Town. Although I credit the testimony of Ms. Dukes, it did not in my view describe unfair or discriminatory treatment of black voters. In essence, Ms. Dukes found that the Republican inspectors at two polling places (each polling place had an inspector from each major party) were insufficiently helpful to apparently unregistered voters (e.g., they failed to advise them of challenge ballots or potential court challenges) and more "aggressive" than Ms. Dukes felt was appropriate. This was not discrimination, invidious or otherwise.

### 2. The Degree Of Racially Polarized Voting

From 1983 to 1993, the successful candidates in every Town Board election consistently garnered between 15% and 29% of the black vote and between 49% and 62% of the white vote. The difference between black and white voter support for the victorious candidate was consistently over 20 percentage points and in most cases over 30 percentage points. In addition, in every election for Town Councilmember, the majority of white

voters withheld their support for the minority-preferred candidate. While other cases have involved a greater disparity between the white vote and the black vote, *see, e.g., City of Niagara Falls,* 65 F.3d 1002 (2d Cir.1995) (where frequently less than 10% of whites voted for a candidate supported by substantial majorities of black voters), there is nonetheless a persistent and significant degree of racial polarization in Town Board elections.

### 3. *Electoral Mechanisms That Enhance Vote Dilution*

While there is no "anti-single shot" rule or majority vote requirement in the Town Board elections, the district is unusually large and there is a prohibition on cumulative voting. These circumstances, and particularly the extraordinary size of the district, significantly reduce the chances of a minority-preferred candidate being elected. As noted, the Town's three-quarters of a million residents apparently make it one of the largest undivided districts in the country. Campaigning is far more difficult than it would be under a single-member districting system. There are upwards of 50 communities in the Town, and the issues of importance to people in those communities vary widely in different parts of the Town. A successful campaign requires the resources to be able to visit, distribute literature to, and address the issues in all areas of the Town. This requires a level of financing that a candidate for Town Board is not likely to achieve. Black Republicans and Democrats alike testified to the difficulties in running in the at-large system due to the sheer size of the jurisdiction. The difficulties faced by the black candidates in these Town-wide elections contrast sharply with their enhanced ability to campaign effectively in smaller districts, such as the 18th A.D. and the new Nassau County legislative districts.

### 4. *Access To Candidate Slating Process*

The Republican Party has had unblemished success in electing its candidates to the Town Board. For nearly a century, every Town Councilmember has been a Republican. The Republican Party endorsement is essential to winning an election in the present at-large system. Indeed, there is a well-founded and widely-held belief that, as defendant Councilmember Curtis Fisher put it, "the Republicans seem to control everything in Nassau County." In testimony I credit, witnesses testified that the Republican Party is so powerful that registration in it is a virtual prerequisite to obtaining public employment at any level—from a laborer with the Town, to a school principal, to a Nassau County police officer.

There are no impediments to blacks joining the Republican or Democratic Parties in the Town, and blacks are not prevented from registering to vote or exercising their right to vote in the Town. Moreover, both the Democratic and Republican clubs in the Town are multi-racial organizations and welcome membership and participation by interested blacks. There are Republican clubs in all of the communities in the Town. These clubs are generally the social arm of the party, and are the gathering points for active party members. The lowest-level governing body of the party is the committee. Each community has one, and it consists of two committee members from each election district. For example, the East Meadow committee has 52 seats, 2 for each of the 26 election districts in East Meadow. Each of those committees elects an executive leader. There are 69 executive leaders in Nassau County, three of whom are black. These 69 executive leaders, together with approximately 20 vice-chairs of the Nassau County Republican Party, meet from time to time with Joseph Mondello, who has been the county chairman for 13 years. Those meetings are called executive committee meetings.

There is a formal procedure for selecting Republican candidates for the Town Board and other elective offices in the Town and the County of Nassau. The county chair will recommend a candidate to the executive committee, which votes on whether to recommend that person to the party's convention, which consists of all of the approximately 2,000 committee members in the county. The convention then votes on the recommendation. The voting system is weighted in accordance with each area's performance in the previous election.

In practice, the slating process is more simple. The executive committee never rejects or even debates the merits of the county chairman's recommendations. It always and unanimously recommends Mondello's selections to the convention, which always and unanimously accepts them. The weighted voting system has never been used, and there has never been a Republican primary for a Town-wide office. In short, while the executive leaders, and presumably others as well, may lobby Mondello in support of proposed candidates, as a practical matter, Mondello selects the party's nominees.[13]

In addition to the many Republican clubs in the villages and unincorporated areas, there is a prominent black Republican organization, the Nassau County African–American Republican Coalition ("A.A.R.C."), which includes various black political leaders (some of whom are clergy) in the Town. The purpose of the coalition is to enhance the role of black Republicans in county, town and village governments in Nassau County. The A.A.R.C. has lobbied Mondello to nominate black Republicans for certain elective offices. These have generally been recommendations for candidates to run on the Republican ticket in majority-minority districts, such as the recommendation of Andrew Hardwick to run in the state's 18th Assembly District. Other successful recommendations included Judge Carnell Foskey, who was appointed a District Court Judge.

However, the Town Board and the Republican Party have not been receptive to the idea that a black should occupy what is perceived in the Town as a far more significant office: Councilmember on the Town Board. To the contrary, the Republican Party has failed to produce a black candidate for Town Board, with the sole exception of Curtis Fish-er in 1993. That exception does not alter my finding that blacks have been denied access to the Republican Party slating process for Town Board elections.

In 1987, two vacancies arose on the Town Board. Patrick Zagarino and Angie Cullen, who are both white Republicans, were appointed to the vacancies. In 1989, there were two more vacancies on the Town Board. When it became known that two more white Republicans would be appointed to fill them, there was a march on Town Hall by blacks seeking the appointment of a black Republican. The protesters included the leaders of the A.A.R.C. This public display of frustration by the most prominent black Republicans in Nassau County did not derail the appointment to the Town Board of two white Republicans, David Levy and Joseph Kearney. In an apparent effort to placate the A.A.R.C., Mondello appointed Curtis Fisher,[14] a black Republican, to the position of Executive Assistant to the Town Board. Fisher lives in the white community of Baldwin Harbor, and had been for many years Mondello's close personal friend and tennis partner.

In 1993, a vacancy arose on the Town Board. When that occurred, the A.A.R.C. recommended Lance Clark, a black attorney who is the Deputy Mayor of the Village of Hempstead. Clark has been a pillar of the black communities of Hempstead and Lakeview. He was active in the NAACP branches in both communities as well as the Hundred Black Men of Nassau, Suffolk, Inc., and Operation Get Ahead, a youth organization. He has been a Republican committeeman in the Village of Hempstead for 14 years. Clark, like many black Republicans, felt that the at-large system deprived the African–American community of representation on

---

**13.** In the Democratic Party, "mini-conventions" are held in the areas that will be represented by the office up for election. Any candidate who does not receive the party's nomination at such a convention is then able, at his or her own expense, to print petitions and gather enough signatures to challenge the nominated candidate in a primary. Primaries resulting from such action have occurred for Democratic Congressional and State Assembly nominations. However, as in the Republican Party, no primary has ever been held for a Town Board nomination.

**14.** Technically, the Town Board, not the party chairman, "appoints" someone to a vacancy or to an executive position in Town Hall. However, as noted above, there is no dispute that Mondello's "recommendations" were always appointed and that he, in substance, placed people on the Town Board. *See, e.g.* Tr. 1204, 1258. Also, at the time, Mondello wore two hats, Presiding Supervisor and Chairman of the Nassau County Republican Party.

the Town Board by a person who lived in that community and had to deal with the day-to-day issues there.

The A.A.R.C.'s recommendation to Mondello that Lance Clark be appointed to the Town Board was rejected. Indeed, Clark was not even interviewed. Instead, without any input from the A.A.R.C., Mondello appointed his close friend Curtis Fisher instead. Fisher had been found less qualified to represent the African–American community than Clark by the A.A.R.C., which had interviewed both before recommending Clark to Mondello.

The parties have vigorously disputed the relative qualifications of Clark and Fisher to be appointed to the Town Board. The plaintiffs correctly observe that Clark had far more involvement in both the community and the Republican Party than Fisher, and was the more qualified and likely candidate for the Town Board, especially considering the emphasis within the party on "paying dues" through loyal and lengthy public service before ascending to higher office. Defendants counter by citing Fisher's background as a star athlete and experience as an educator, and further point out that there is nothing wrong or unusual about rising in politics by playing tennis with a power broker. Although the plaintiffs have the better of this argument, the issue before me is not whether the Nassau County Republican Party appoints or nominates the best available Republicans, or the most deserving ones, but whether its slating process for Town Board seats is truly open to blacks. Despite the appointment of Curtis Fisher—indeed, in part *because* of it—the events of 1989 and 1993 cause me to conclude that it is not.

I am further persuaded of this by the testimony of the Town's prominent black Republicans regarding their efforts to penetrate the appointment and slating process for Town Board seats. There is no dispute that, as noted above, black Republicans fervently wanted representation on the Town Board,

and their frustration at the party's failure to provide it in 1989 had bubbled over to produce the march on Town Hall. It is also clear that the A.A.R.C. had enjoyed success in recommending to Mondello blacks for appointment to or nomination for lesser positions and for offices in majority-minority districts. However, the A.A.R.C. had not, in either 1987 or 1989, recommended anyone to Mondello for the Town Board. The testimony of prominent black Republicans revealed inconsistent explanations for that. Robert Francis, the Town's Commissioner of Planning and Economic Development, attributed it to the lack of black Republicans interested in the position. Briding Newell, another prominent black Republican who currently works as an analyst with the county legislature, testified that the A.A.R.C. decided in 1993 that its longtime lobbying for a Town Board seat would be stronger if it finally "attached a name to the process."

It is possible to make too much of this conflict, which I attribute to the palpable discomfort these otherwise impressive witnesses exhibited in testifying about their own party's treatment of black Republicans' efforts to obtain representation on the Town Board. They were not alone in this regard. Lance Clark himself—the A.A.R.C.'s choice for Town Board, who was flatly rejected by Mondello—testified unconvincingly that the Nassau County Republican Party is receptive to the recommendations of the A.A.R.C., which Clark described as Mondello's "African–American community advisors."[15] In any event, I conclude that Town Board seats were sufficiently beyond the realm of possibility for black Republicans that they never even attempted to obtain one through the normal party mechanisms until 1993. And then they were simply shut out. Gregory Peterson, a Republican who is the Town Supervisor, testified that the party sought in 1993 to show that it was open to everyone, to "reach[ ] out to the African–American community."[16] I do not credit this testimony, because the facts show that rather than ap-

---

15. While the party acceded to A.A.R.C. requests to place black Republicans in a small number of judgeships and commissioner positions in Town government, even Clark believed that Mondello had snubbed the A.A.R.C. by appointing to the Town Board a black Republican who neither lived in the black community nor had "paid his dues" sufficiently to merit town-wide office.

16. Tr. 1437.

point the person recommended by the party's own black members, a "safe" black Republican was appointed instead.[17]

### 5. Discrimination In Other Areas Which Hinders Blacks' Ability To Participate In Political Process

Plaintiffs presented the expert testimony of Dr. William O'Hare regarding the socioeconomic status of blacks in the Town. Dr. O'Hare obtained data from the U.S. Census Bureau and a variety of academic and professional publications to examine the relationship between the socioeconomic status of blacks in the Town and their participation in the political process.

There is an income differential among blacks and whites in the Town. The median household income of blacks is $45,418, as compared to $53,574 for whites. There is a higher per capita income among whites and a higher unemployment and poverty rate among blacks. With respect to the type of jobs held by blacks and whites, 60% of blacks and 73% of whites were in white-collar jobs.

There is also a disparity in the educational levels attained by blacks and whites in the Town. For example, 17% of blacks have at least a four-year college degree, as compared to 29% of whites; and 76% of blacks have a high school degree, as compared to 85% of whites. Finally, blacks are less likely than whites to own a home, a car, and a telephone, and the homes that are owned by blacks have a lower median value than the homes owned by whites.

These differences notwithstanding, on the whole, blacks in the Town of Hempstead have fared well. The median household income of black families in the Town far exceeds that of (a) blacks in the United States; (b) blacks in New York State; (c) whites in the United States; and (d) whites in New York State. Forty-four percent of the blacks in the Town earn more than $50,000 per year. Home ownership by blacks (62%) in the Town exceeds the national average, as does the median value of owner-occupied homes ($162,800). Indeed, in an unrelated study of the best places for blacks to live, Dr. O'Hare rated the Nassau–Suffolk area, which embraces the Town, first among 48 metropolitan areas in the country.

In sum, as in most metropolitan areas, blacks in the Town have a lower socioeconomic status than whites. As a result, there are mild differences in the abilities of blacks and whites to participate in the political process. For example, it is more difficult for people employed in blue-collar jobs where they are paid by the hour to take time off from work to go to the polls. Also, those with lower incomes obviously have less money to contribute to political campaigns. However, in the Town of Hempstead, these differences in the socioeconomic status of blacks do not significantly impair their relative ability to participate in the political process.

### 6. Racial Appeals In Political Campaigns

The western part of the Town borders on the New York City borough of Queens. Several of the Queens neighborhoods along that border are predominantly black. Until fairly recently, the Elmont and North Valley Stream CDPs, like the other parts of the Town bordering Queens, were predominantly white. In the past fifteen years, black flight from Queens to the Nassau County suburbs has caused some racial tension in the Town. This tension resulted in some troubling appeals to racism in campaign literature.

In a late 1970s campaign for a State Senate seat from an Assembly District within the Town, the incumbent Republican appealed to the fears of Town residents that black students from Queens would be bused to schools in the Town. The campaign literature used pictures of black children in school buses to convey the message that voting for the Democratic opponent would result in such busing.

In 1987, the racial composition of the communities of Elmont and North Valley Stream was in transition. Although certain neighborhoods in these communities are now predominantly black (see A–1), they were then still predominantly white, but were showing the effects of the influx of blacks from Queens. The campaign literature of incum-

---

**17.** See pp. 344–346, infra.

bent Republican Town Councilman Joseph Cairo sought to appeal to the anti-black sentiments aroused by this migration.

Specifically, Cairo's brochure, under the heading "Preventing Urban Encroachment," stated that he was "well aware of his community's proximity to the City of New York," and the attendant risk of "urbanization." Cairo claimed to be "a major opponent of those who seek to 'Queensify' North Valley Stream and its environs." Under the heading "Crime," Cairo's brochure warned of the possibility of "urban crime spilling over the county border." He claimed to be the "unofficial liaison with the Nassau County Police Department," in which capacity he "sensitized local patrolmen to the special concerns of the community." These statements were contained in a brochure that included seven photographs of Cairo with approximately three dozen members of the Elmont and North Valley Stream communities; none of the photographs included a black person.

There was evidence, which I credit, that the "sensitizing" of the police department resulted in an unofficial border patrol policy: if black youths from Queens ventured across the border, the police were to stop them, find out their business and ensure that they "go back where they belong." Specifically, Melvin Boone, a registered Republican and a detective with the Nassau County Police Department, was a uniformed officer in 1986 in the Fourth Precinct. That precinct included Inwood, which, like Elmont and North Valley Stream, borders Queens and included neighborhoods that were becoming increasingly black. Detective Boone testified that, although there was no explicit directive, the "overwhelming feeling" within the department was that its job was to keep Queens blacks out of the border neighborhoods, and border patrols were conducted accordingly.

It is true, as defendants contend, that the language in Cairo's campaign brochure is subject to different interpretations. One reading of it is that Cairo would simply work to keep the suburban areas from becoming too commercialized and crime-ridden. The plaintiffs, supported by the testimony of witnesses, argue that a different meaning was intended. For example, if the brochure was truly addressing a crime problem, plaintiffs contend, why does it mention "urban" crime?; if commercialization was the concern, why use "Queensification?" They argue that, in the western part of the Town in the late 1980s, these were thinly-veiled code words for anti-black sentiment.

Although some light could presumably be shed on these issues by Cairo himself, who is a sitting Town Councilman and a defendant in this case, he elected not to testify. I find that in the particular circumstances at that time and in those communities, Cairo's campaign literature was *perceived*, reasonably, as a promise to stem the tide of blacks across the Queens border into Elmont and North Valley Stream. As noted, other evidence supports plaintiffs' claims that the Town Board—perhaps through Cairo himself—used its unofficial influence over the police department to further this goal.

There was testimony, which I credit, that this particular piece of campaign literature in Cairo's 1987 campaign was part of a larger pattern of Republican campaign materials that were characterized by subtle racial appeals, which sought to depict the integration of white areas as a threat, and to prey on the fear of such a threat.

### 7. *Minorities Elected To Public Office*

Under the functional view of the political process mandated by Section 2, the most important factors bearing on a challenge to a multimember system are the extent of racial polarization and the extent to which minority group members have been elected to public office in the jurisdiction. *Gingles,* 478 U.S. at 48 n. 15, 106 S.Ct. at 2765 n. 15 (citing Senate Report at 28–29). Between 1907 and 1993, every member of the Town Board was a white Republican. In 1993, Curtis Fisher, a black Republican, was appointed to a vacancy on the Board, and he successfully ran for election later that year. To this day, he is the only nonwhite member in the history of the Town Board.

To be sure, black Republicans have been appointed or elected to other positions in the area. Alfred Robbins, Carnell Foskey and Leonard Clark were elected to Nassau County District Court, and Gerald Carter

was appointed to that position. James Garner, Lance Clark, Jacqueline Jackson and Ralph Smith have been elected to governmental positions in the villages of Hempstead and Freeport. In addition, black Republicans have been appointed to policymaking positions in the Town: Robert Francis (Commissioner of Planning and Economic Development); Clinton Boone (Commissioner of Occupational Resources); and Briding Newell (Commissioner of the Department of Drug and Alcohol).

The defendants further rely on the appointment of some black Republicans to other Town and party positions, but the most critical fact in this regard is that until the election of Curtis Fisher in 1993, no African–American was ever elected to the legislative body at issue in this case. As for the election of Fisher, plaintiffs contend that it should be disregarded entirely. The Senate Report acknowledged the risk that "the majority citizens might evade the section[,] e.g., by manipulating the election of a 'safe' minority candidate." Senate Report at 29, n. 115, 1982 U.S.C.C.A.N. at 207. Plaintiffs contend that the appointment of Fisher, followed by his inevitable election to the position, was such a manipulation. For the reasons set forth in the next section, I find this argument persuasive.

### 8. *Responsiveness By Elected Officials To Minority Needs*

The plaintiffs contend that the Town Board has been unresponsive to various needs of the black communities in the Town. Although their claims are not borne out by the evidence in all respects, there is nevertheless substantial evidence that the Town Board is unresponsive to the particularized needs of the black communities in the Town.

In this regard, evidence of tangible efforts of elected officials to respond to the needs of the minority group is relevant. Senate Report at 29 n. 116, 1982 U.S.C.C.A.N. at 207; *City of Niagara Falls,* 65 F.3d at 1023 n. 24. In *City of Niagara Falls,* for example, the court found relevant that the defendant city had established a Human Rights Commission, which began an Affirmative Action Task Force to increase minority enlistment in the police and fire departments. The city further established programs to promote the integration of its schools, community policing in black neighborhoods and loans to minority business owners. 65 F.3d at 1023.

This case stands in stark contrast. When Gregory Peterson, the Town Supervisor, was questioned about the fact that no affirmative action resolution had ever been proposed by Curtis Fisher, he explained that none was necessary because "We have an affirmative action policy" and "an affirmative action officer." Fisher himself testified that he was appointed Affirmative Action Officer in 1989, succeeding Carnell Foskey.

However, there was no affirmative action policy at all. The only policy was a prohibition of overt racial animus in Town government, and both Peterson and Fisher consider that affirmative action.[18] The Affirmative Action Officer for the Town received no training, was not familiar with anti-discrimination laws, and was not familiar with standard forms used by the Equal Employment Opportunity Commission. As noted, there was nothing that could accurately be described as affirmative action; the policy was merely an anti-racial slur policy.

Even at that, it was not much of a policy. As Affirmative Action Officer, Fisher sought to solve race discrimination problems informally, "rather than going through a court case and going through the Human Rights Commission and blowing things all out of proportion." Unfortunately, this produced no apparent solutions at all. For example, Earlwin Warren, like several witnesses in this case, registered as a Republican because he shared the view (which was widely held and often stated in the Town) that doing so was the only way to be successful in the Town. A committee member from Uniondale from 1988 to 1991, he worked actively for the party. Warren was also employed by the Town, in the Department of Sanitation. Upon his return from military service in Operation Desert Storm, he was promoted to labor foreman. Warren was treated badly by other members of the department, both

18. *See* Tr. 1449–51; 1889–90.

with respect to work assignments and through the use of racial epithets and other verbal abuse in the workplace.

When Warren brought these conditions to the attention of the Town, Fisher investigated in his capacity as Affirmative Action Officer. He concluded that Warren was subjected to racial discrimination in the Department of Sanitation, including being berated as a "nigger" by a Town co-worker in a Town workplace. When asked if the offending employee was disciplined, Fisher first testified that it "depends how you define discipline;" he then admitted that he never bothered to find out whether any action was taken against the offending employee.[19] Fisher made no report or recommendation to the Town Board, and there was never any sensitivity training for the employees in that department. When Warren applied to speak before the Town Board, it did not allow him to complete his statement to the Board, but rather assigned a staff member to speak with him one-on-one. Indeed, Peterson never even became aware that his Affirmative Action Officer had concluded that Warren had been subjected to race discrimination and called a "nigger" in the workplace by his fellow Town employees.

San Salvadore Bloomfield, an immigrant from Jamaica and a member of the Uniondale Republican Club, worked for the Town as a part-time carpenter. He complained to Fisher, who by that time was a member of the Town Board, that two white carpenters were hired into full-time jobs ahead of him, and that this could only have been the result of discrimination on the basis of race and national origin. Fisher spoke to the Town's Personnel Director, but reported back to Bloomfield that there was nothing Fisher could do. This was true even though Fisher believed Bloomfield should have gotten the job, and recommended to Peterson that it be given to him. Bloomfield subsequently sued the Town. Even after Bloomfield established in that action that he was the subject of unlawful discrimination, and received a judgment against the Town, the Board took no action, and declined to provide any sensitivity training to Town employees in that department.

Although the Town does not directly control the village fire departments, it can influence such entities through the allocation of funds and through the substantial political influence elected officials have in the Town. Thus, the Town Board's inaction upon learning that a trophy on display in the Freeport Volunteer Fire Department bore the inscription of the Ku Klux Klan further demonstrates an insensitivity to the concerns of the blacks in that predominantly minority community and in the Town as a whole.

There have been other instances of unresponsiveness on the part of Town officials to the needs of the black communities in the Town. For example, residents of the Lakeview community sought funding from the Town for a community center. They were turned down on the ground, stated by Councilman Fisher, that funding the center would "open a whole can of worms," in that it would essentially require the Town Board to fund other communities' similar requests. Although that response seems innocuous on its face, the brunt of this policy fell almost entirely on the black communities; with one exception, the other requests for community center funding were from other black communities: Uniondale, Roosevelt, and the black community in Elmont. Councilman Fisher never even attempted to procure Town funding for these community centers.[20]

Similarly, the commercial center of Roosevelt, which is located on Nassau Road, has fallen upon hard times. A plan for its redevelopment—which included the construction of a number of residential structures—

19. Tr. 1869–70.

20. Defendants' response to this complaint of insensitivity was somewhat disingenuous. Mr. Fisher initially suggested that Lakeview's request for funding resulted in the Town's assistance in funding a Police Athletic League ("PAL") facility in Roosevelt. However, further examination revealed that (a) the PAL facility did not constitute a substitute for the community center; (b) the Town's assistance to that project was not in response to the community's request for a community center; (c) none of the black communities' requests have been granted; and (d) the Town has evidenced no interest in those communities' efforts to raise the money in other ways.

met with community opposition and became stalled at least as early as 1992. Sorely in need of attention, the problem has languished ever since, and Councilman Fisher, who is held forth by defendants as the point man for problems in the black communities, stated only that he will make a recommendation to the Town Board when he feels comfortable he has a solution that everyone will like.

The black communities are not entirely ignored by the Town Board. It has built housing in Roosevelt, and has expended more than $6.6 million in road construction projects there in the last two years, to cite just two examples. The persistent assertion by plaintiffs that the location of the Echo Park pool, the only indoor pool in the Town, evidences racial discrimination because it is in a white neighborhood is entirely without merit. Also, many services about which complaints have been made are the principal responsibility of other governmental entities, such as villages, the county, or water or sanitation districts. Perhaps most importantly, Robert Francis, a black Republican who now serves as Commissioner of Planning and Economic Development, has worked hard for many years to respond to the concerns of the black communities, including his home community of Roosevelt. In those instances where he has not met with success, it has not been due to insensitivity, lack of diligence or lack of ability.

However, on balance, viewing all of the evidence as a whole, plaintiffs have established a significant lack of responsiveness to the particularized needs of blacks in the Town. Most significantly, they have established indifference and callousness on the part of the Town Board with respect to the issue that probably matters most to blacks: racial intolerance and bigotry in Town government itself. It is a government that, in all seriousness, regards a prohibition against overt racial animus as affirmative action, and even when such animus is brought to its attention, takes no action at all.

### 9. *The Tenuousness Of The Policy Underlying At-large Elections*

At-large voting practices are not *per se* violative of Section 2, and plaintiffs are not entitled to relief simply because a councilmanic district system might better serve the blacks in the Town. The Senate Report factors, on the other hand, include an inquiry into whether the policy purportedly advanced by the challenged practice is tenuous. Here, that factor weighs in favor of the plaintiffs.

Gregory Peterson, the Town Supervisor, rendered the following opinion regarding the advantages of the at-large system:

I believe an at-large system in a middle class suburban township is an appropriate form of government. It doesn't allow for wiggle room. Each councilman has to run in each area of the township, has to be responsible and responsive to each area of the township, has to know the concerns throughout the Town of Hempstead and runs in each and every area.

Most people in—most people in a suburban area have come from open spaces, have come from less government, want less government not more government....[21]

The deficiency of a district system, according to Peterson, is that the residents of a particular district would suffer if they have a weak representative on the Town Board. Even if the weakling were a Republican, the failure "to get his or her point across" could result in all the "negative things" happening to that one district. Peterson further testified that if a district were represented by a Democrat—black or white—it would breach the "oneness" of the "suburban mentality, open air mentality, which is the same throughout an entire area," and that district could end up, for example, having all the undesirable public facilities placed within its borders.[22]

I find these purported advantages, elicited by the defendants in support of the status quo, to be tenuous. First, a switch from an at-large system to a councilmanic one does not produce "more government," as Peterson suggests. Plaintiffs do not seek to enlarge

---

**21.** Tr. 1350.

**22.** Tr. 1351–54.

the Town Board or its authority. Second, the defendants' claim that the at-large system guards against ineffective representation by a weak councilperson in a district system ignores the fact that such a system would enhance the black communities' ability to vote someone *out* of office, not just into it, which may be a more powerful safeguard against ineffective representation. The evidence has established that members of the black communities in the Town do not have a Town Board member who is accountable to them. Although, as discussed below, the Town Supervisor has informally created some *de facto* districts, black citizens in the Town justifiably believe that they have no one to turn to on the Board. The Councilmembers, who in most instances ignore the concerns of the black communities, can afford to do so because they can count on receiving sufficient votes from other areas to keep their seats on the Town Board.

I recognize that the "comparative merits of the [single-member versus at-large] approaches to metropolitan representation [have] been much mooted and [are] still in contention," *Whitcomb v. Chavis,* 403 U.S. 124, 154 n. 33, 91 S.Ct. 1858, 1874 n. 33, 29 L.Ed.2d 363 (1971), and that multi-member districts are not *per se* unlawful. However, defendants' reliance on the familiar argument that Councilmembers elected at-large represent everyone is further undermined by what in fact occurs in the Town. Defendants contend that the current system avoids "carv[ing] the town into small little districts, where people fight over provincial issues." [23] However, the evidence reveals that the Town is sufficiently large and unwieldy that the Town Board has created *de facto* districts, assigning principal responsibility for areas in the Town to particular members. For example, before Curtis Fisher was appointed to the Town Board in 1992, Joseph Cairo, who as noted above resides in North Valley Stream, was "in charge" of Lakeview, one of the predominantly black neighborhoods.[24] Fisher, who also does not reside in one of the black communities, was assigned this respon-

sibility by Peterson upon joining the Town Board. These and other assignments have been and continue to be made by Peterson "in order to make things work in a more efficient manner[;] it's broken up so that councilmen would oversee certain [geographic] areas." [25] This *de facto* districting supports the plaintiffs' claim that the Town is simply too big and diverse for its governing body to be elected at-large and undermines the defendants' justification for that practice.

Finally, the most tenuous aspect of the Town's defense of the at-large system is Mr. Peterson's contention that it produces better government for the black communities. The argument goes as follows: the Town Board members are currently responsive "to the entire town's needs." When it must locate a recycling plant, for example, it does "the right thing," without reference to politics. If the blacks succeed in imposing single-member districts, and can then elect a candidate of choice, they will elect a Democrat. According to Peterson, then "you wind up with a very parochial attitude," and rather than doing the "right thing," the Republican majority's baser instincts will cause it to dump on the "Democratic zone." [26] Put another way, the defendants contend that the blacks will get better, more benevolent government if they continue never to elect their preferred candidates than if they finally elect a candidate of their choice to represent their communities' specific needs.

Although this contention is troubling in several respects, it is sufficient to observe that it cannot be reconciled with the purpose or terms of Section 2 of the Voting Rights Act.

### 10. *Political Partisanship*

In addition to analyzing racial polarization in the Town Board elections, defendants' expert, Dr. Stanley, used regression analysis to determine the relationship between voter support and the partisan registration of election districts. He found that higher percentages of blacks supported Democratic candi-

**23.** Tr. 22.

**24.** Tr. 1769, 1858.

**25.** Tr. 1857; *see also* Tr. 640, 1352.

**26.** Tr. 1353–54.

dates than Republican candidates, and higher percentages of whites supported Republican candidates than Democratic candidates. This finding is consistent with Dr. McDonald's findings and with the party registration of black and white voters. Among black voters in Hempstead, 68% are registered Democrats and 22% are registered Republicans. Among white voters in Hempstead, 51% are registered Republicans and 26% are registered Democrats.

To measure the effect of political partisanship, Dr. Stanley compared two regression analyses: one measured the strength of the relationship between the partisan composition of an election district and the level of support for each candidate; the other measured the strength of the relationship between the racial composition of an election district and the level of support for each candidate. He found that in every Town Council election and for every candidate, changes in support for a candidate were greater when the partisan composition of an election district changed than when the racial composition changed. Therefore, he concluded that the relationship between the partisan composition of an election district and the level of support for a candidate was stronger than the relationship between the racial composition of an election district and the level of support for the same candidate.

Dr. Stanley also found that regardless of the race of the Democratic or Republican candidate, they received similar levels of support in every election. That is, when a black Republican, Curtis Fisher, ran for election in 1993, he received a similar level of support from white voters as did the white Republican candidates. When a black Democrat, Michele DeFreitas, ran for election in 1993, she received a similar level of support from white voters as did the white Democratic candidates. Moreover, Dr. Stanley found that Republican candidates received a greater level of support from Republican voters and Democratic candidates received a greater level of support from Democratic voters, regardless of the race of the candidate.

Dr. Stanley concluded that while there was a pattern of racial polarization, there was a stronger pattern of political partisanship, which had the secondary effect of racial polarization because blacks preferred Democratic candidates and whites preferred Republican candidates.

## III. CONCLUSIONS OF LAW

### A. The First Gingles Precondition

■ The first precondition plaintiffs must satisfy is that the minority group be sufficiently large and geographically compact to constitute a majority in a hypothetical single-member district. *Thornburg v. Gingles*, 478 U.S. 30, 50, 106 S.Ct. 2752, 2766, 92 L.Ed.2d 25 (1986). If it is not, the multimember form of government cannot be responsible for its inability to elect its candidates of choice, *id.*, and in any event a court could not fashion a remedy for a demonstrated dilution of its voting strength. In short, unless minority voters are sufficiently numerous and compact that they have the potential to elect representatives in a single-member system, they cannot claim that their voting rights have been infringed by a multi-member system. *Gingles*, 478 U.S. at 50, n. 17, 106 S.Ct. at 2766, n. 17.

■ Here, plaintiffs have proved that blacks in the Town of Hempstead would constitute a majority of the voting age population in one of six single-member districts. The six proposed districts are of almost equal population. Proposed District 3 has a voting age population that is 52.57% black. This percentage of black voters constitutes both a majority and a sufficiently large percentage of voters in that district to give blacks the potential to elect their preferred candidate. *Westwego Citizens for Better Government v. Westwego*, 946 F.2d 1109, 1117 (5th Cir.1991) (proposed district with black voting age majority of 52.8% satisfies the first *Gingles* precondition). Dr. McDonald's performance analysis indicated that, with white cross-over voting, blacks would have had to comprise 44.6% of the voting age population in a single-member district in 1993 to enable them to elect their preferred candidate. Since proposed District 3 easily exceeds that percentage, the black population in the Town is sufficiently large to meet the first *Gingles* precondition.

The black population is also sufficiently compact geographically. Indeed, using compactness measurements such as the ratio of the actual area to the ideal area and the ratio of the actual perimeter to the ideal perimeter, the proposed majority-minority district is more compact than the 18th State Assembly district and the average U.S. Congressional district. The proposed majority-minority district virtually overlaps the existing 18th State Assembly District. Moreover, the boundaries of the proposed single-member districts generally follow the existing borders of villages or unincorporated areas. There is only one village that is split between districts (Freeport) and two Census Designated Places that are split (North Bellmore and West Hempstead). While the proposed districts also split two communities—the "Five Towns" and the "tri-Community"—there was no showing that any common interests held by the villages or areas within these communities would be adversely affected.

In any event, the proposed districts are not "cast in stone." *Clark v. Calhoun County, Miss.*, 21 F.3d 92, 95 (5th Cir.1994). They were proposed to demonstrate the feasibility of a single-member district that would be both majority-minority and drawn in accordance with traditional districting principles. The Town itself will have the first opportunity to fashion a remedial plan, and if in doing so it wishes to reunite Hewlett with the rest of the Five Towns (to pick one example), it is free to attempt to do so, and the evidence before me indicates that this adjustment is feasible.

The defendants' other challenges to the proposed District 3 have no merit. They claim that Dr. Beveridge ignored the local political geography by crossing Hempstead Lake into the village of Rockville Centre to "capture" some blacks, but the evidence establishes beyond doubt that no such encroachment occurred. Rather, the record reveals that the Rockville Centre side of the lake is shaded on Plaintiff's Exhibit 4D only because that reflects the boundary of the census block known as the Lakeview CDP, not because persons living on that side of the lake were included in District 3. Indeed, the evidence demonstrated that no one resides in the shaded area east of the lake.[27]

Proposed District 3 divides the Village of Freeport, and defendants challenge the decision to cross a natural boundary, Sunrise Highway, to include an area south of that thoroughfare in the proposed district. However, while the decision to cross Sunrise Highway is challenged as an effort to "scoop up more black citizens," it was in fact an effort to comply with the one-person, one-vote criterion. Indeed, the portion of District 3 that is south of Sunrise Highway is predominantly white, and its addition actually lowered the percentage of blacks in the district. It is true, as defendants point out, that Dr. Beveridge could have added more people to District 3 by adding part of the adjacent South Hempstead CDP, which is overwhelmingly white. However, it is equally true that he could have added a portion of northeast Baldwin CDP, which is both adjacent to District 3 and predominantly black. I credit the testimony of Dr. Beveridge that crossing Sunrise Highway to include more of the village of Freeport in District 3 was a reasonable judgment that was motivated by the one-person, one-vote principle. The remaining objections by the defendants to the proposed districts, including the uncharacteristic hyperbole that one part of proposed District 6 is "across the Atlantic Ocean" from the rest, do not alter my conclusion that the first prong of the *Gingles* test has been satisfied.

■ Finally, defendants object to blacks, who comprise 12.1% of the electorate, gaining the ability to control (through a single-member district) 16.6% of the six Council seats. To be fair, plaintiffs actually seek approximately 14% of the voting power on the Town Board, taking into account the voting power of the Supervisor. In any event, "[j]ust as the proviso to § 2(b) ensures that white candidates are free to compete for electoral success that exceeds the ratio of white voters, so blacks must be free to compete for favor; the Voting Rights Act neither sets nor tolerates a cap on their achievements." *Baird v. Consolidated City of In-*

---

27. *See* Tr. 203–11, 222, 2090; Def.Ex. 5–E; Pl. Ex. 4–G.

*dianapolis,* 976 F.2d 357, 359 (7th Cir.1992), *cert. denied,* 508 U.S. 907, 113 S.Ct. 2334, 124 L.Ed.2d 246 (1993).

■ In sum, the compactness of the black population in the Town of Hempstead stands in stark contrast to the diffusion of blacks in its neighboring Long Island town, the Town of Babylon. There are multiple possible single-member district schemes in this case that do not require a "convoluted" majority-minority district with "narrow corridors" connecting pockets of minorities "sprawl[ed] across the Town." *Reed v. Town of Babylon,* 914 F.Supp. 843, 872–73 (E.D.N.Y.1996). Rather, plaintiffs have amply demonstrated that a majority-minority district can be fashioned without subordinating traditional districting principles to racial considerations, and have proved that the black population in Hempstead is sufficiently large and geographically compact to constitute a majority in a single-member district.[28]

### B. *The Second Gingles Precondition*

■ Defendants concede that black voters in the Town are politically cohesive in their support for Democratic candidates over Republican candidates. In every Town Board election analyzed by plaintiffs and defendants, except for the 1985 election, a majority of blacks supported a particular Democratic candidate. Therefore, plaintiffs have proved that black voters in the Town are politically cohesive.

28. In its evaluation of the *Gingles* criteria, the court in *Reed* applied the same standard of compactness as that required by the Supreme Court in *Miller v. Johnson,* —— U.S. ——, ——, 115 S.Ct. 2475, 2488, 132 L.Ed.2d 762 (1995). *Reed,* 914 F.Supp. at 871. *Miller* was a constitutional challenge to the validity of congressional districts drawn by the Georgia state legislature.

However, a relaxed standard of compactness applies to districts drawn to remedy a Section 2 dilution violation. *Bush v. Vera,* —— U.S. ——, —— – ——, 116 S.Ct. 1941, 1960–61, 135 L.Ed.2d 248 (1996) (states may depart from traditional districting principles such as compactness to remedy Section 2 violation, so long as the departure is narrowly tailored). Accordingly, where a remedial district is drawn to satisfy Section 2, the district might be constitutional even though it would not be constitutional outside the remedial context.

### C. *The Third Gingles Precondition*

■ The third precondition plaintiffs must satisfy is that there is "legally significant white bloc voting" in the Town. That is, the plaintiffs must show that the white majority votes sufficiently as a bloc to enable it usually to defeat the minority-preferred candidate. *Gingles,* 478 U.S. at 50–51, 106 S.Ct. at 2766–67; *see also Uno v. City of Holyoke,* 72 F.3d 973, 985 (1st Cir.1995) (to be legally significant, racially polarized voting in a specific community must be such that, over a period of years, whites vote sufficiently as a bloc to defeat minority candidates most of the time). As noted earlier, *Gingles* instructs that "in general, a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." *Gingles,* 478 U.S. at 56, 106 S.Ct. at 2769. However, depending on the features of a particular electoral system, such as the presence or absence of other dilutive practices (*e.g.,* majority vote requirements or prohibitions on single-shot voting), the size of the jurisdiction, the number of seats open, and the number of candidates in the field, the degree of white bloc voting that will generally preclude the black voters from electing their preferred candidate will vary from case to case. *Id.*

Critical to the analysis of whether minorities have been able to elect their preferred candidates is identifying what a "minority-preferred candidate" is. Although this term was not defined in *Gingles,* 478 U.S. at 51,

This relaxed standard of compactness must apply in evaluating the first prong of *Gingles* as well. If the stricter *Miller* standard applied at the *Gingles* precondition stage, the *Vera* language permitting departure from traditional districting principles would be undermined, since any case requiring such departure would be weeded out at the *Gingles* stage by applying the stricter standard. Thus, the appropriate question in evaluating the first prong of *Gingles* is whether the minority population is sufficiently large and compact to create a district under the relaxed criteria set forth in *Vera.*

In this case, it does not make a difference which standard applies because the proposed majority-minority district in the Town is sufficiently compact, contiguous, and respectful of political subdivisions that it would withstand scrutiny even if it were not proposed to remedy a Section 2 violation.

106 S.Ct. at 2766–67, district judges in this circuit have guidance from *City of Niagara Falls*, which sets forth the following rule:

> For purposes of analyzing the third prong of *Gingles*, in § 2 cases in which the plaintiffs seek to replace an at-large, multimember electoral system with a series of single-member districts of which one or more would be a so-called majority-minority district, a candidate cannot be "minority-preferred" if that candidate receives support from fewer than 50% of minority voters. When a candidate receives support from 50% or more of minority voters in a general election, a court need not treat the candidate as minority-preferred when another candidate receiving greater support in the primary failed to reach the general election. Finally, even if a candidate receives 50% or more of the minority vote, a court need not treat the candidate as minority-preferred if another candidate receives significantly higher support.[29]

> \*　　\*　　\*　　\*　　\*　　\*

> This rule means that, in any given election in a multimember scheme—where more than one contestant is elected to office in one election—a court may treat more than one candidate as the "minority's preferred candidate," or none at all.

*City of Niagara Falls,* 65 F.3d at 1019.

■ It is undisputed in this case that whenever a black Democratic candidate ran for the Town Board, he or she was the most preferred candidate among black voters and in all but one election the black Democrat garnered over 50% of the black vote.[29] It is also undisputed that in every Town Board election, except in the 1987 election, there was at least one and sometimes there were two or three minority-preferred candidates. Finally, there is no dispute that every minority-preferred candidate for Town Councilmember lost to the majority-preferred candidate as a result of white voters voting for candidates the black voters did not support. Accordingly, there is a persistent pattern of racially polarized voting in Town Board elections that consistently has resulted (and will

result in the future) in the defeat of the minority-preferred candidate. I conclude that this is sufficient to satisfy the third *Gingles* precondition, *i.e.,* that there is legally significant white bloc voting. *Gingles,* 478 U.S. at 60, 106 S.Ct. at 2771.

### D. *The Totality Of The Circumstances*

As set forth in Part I, the satisfaction of the three *Gingles* preconditions is not, standing alone, sufficient to establish a § 2 violation. I must now consider whether the totality of all the relevant circumstances reveals that the at-large electoral system for the Town Board impairs the ability of black voters to participate equally in the political process and to elect candidates of their choice. I conclude that the answer is yes, and that this feature of the Town government therefore violates Section 2 of the Voting Rights Act.

I have set forth in Part II, *supra,* my factual findings with regard to the Senate Report factors to be considered in evaluating the totality of the circumstances, and will not repeat those findings here. By way of summary, however, my analysis has led me to conclude as follows.

■ Although there is no history of *de jure* discrimination in the Town, the "nonvoting" purging provision of New York Election Law and, to a somewhat lesser extent, the literacy test used by the Town until 1969 had a meaningful adverse impact on the registration of black voters. The disparate socioeconomic status of blacks in the Town tends to further depress their political participation, albeit not dramatically.

Racially polarized voting in the Town is significant and persistent. The invidious effect of these divergent voting patterns is especially apparent where, as in this case, the district is large in relation to the total number of legislators, the entire legislature is elected at-large, and there is no provision for at-large candidates running from geographic subdistricts. *Whitcomb v. Chavis,*

---

**29.** In all but the 1993 election an African–American Democrat ran for office. In 1993, the most preferred candidate among African–American voters was a white Democratic candidate, Vivian DeJong.

403 U.S. at 143–44, 91 S.Ct. at 1869–70 (citing *Fortson v. Dorsey,* 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965)); *Burns v. Richardson,* 384 U.S. 73, 88, 86 S.Ct. 1286, 1294–95, 16 L.Ed.2d 376 (1966).

If, as the Supreme Court has observed, "[o]ne may suspect vote dilution from political famine," *Johnson v. De Grandy,* 512 U.S. at 1017, 114 S.Ct. at 2660, then one may strongly suspect vote dilution in the Town of Hempstead. The black-preferred candidates for Town Councilmember have not been elected. The one black who was elected was not preferred by the black voters, and indeed was not even preferred by the leading black Republicans. Practically speaking, blacks have been shut out of the Town Board elections, a result made possible by the at-large system, which unfairly minimizes their demonstrated voting strength, and the Republican Party's slating process.

The Town Board has remained largely unresponsive to the particularized needs of the black communities in the Town, a state of affairs that I conclude is fostered (if not caused) by the multimember district. At-large elections mean that no Town Councilmember is accountable to blacks, and thus no one is held accountable for neglecting the needs of their communities. No one has the political incentive to breach the "oneness" of the current Town government.

The defense of this form of government, which has prejudiced blacks significantly, is based on a view of the Town which, described charitably, is anachronistic. The Town Supervisor testified that there is a "suburban mentality" that "is the same throughout [the Town]". The evidence in this case virtually compels a contrary conclusion; the Town of Hempstead is huge, and its more than 50 communities have many different needs, problems and concerns.

This insulation of Town Councilmembers from the black communities is exacerbated by the inaccessibility of the Republican Party's slating process to blacks in the Town. Blacks are indeed welcome in the Republican

Party, and a small number have thrived there, receiving appointments to significant positions in local government. But the office of Town Councilmember has remained, as a practical matter, off limits to black Republicans. I categorically reject the defendants' assertion in closing argument that as long as the Democratic Party is open to black participation, the Republican Party can exclude blacks entirely.[30] That argument cannot be reconciled with the practical, functional approach mandated by Section 2. In the Town of Hempstead, access to the Democratic Party's slating process does not constitute an opportunity for blacks "to elect representatives of their choice." If it did, defendants' argument may present a different question, one I need not address in this case, where diminished access to the Republican Party's slating process is the functional equivalent of diminished access to the political process itself.

The political insulation between the black communities and the Town Board that results from the at-large system may also account for the board's unresponsiveness to concerns about racial prejudice. The Town is not required to implement affirmative action programs to benefit (for example) minority employees or minority-owned companies that seek to do business with the Town. However, the misapprehension by Town officials of what the term "affirmative action" means reflects a profound callousness toward the needs and concerns of the black communities. This callousness is further reflected in the lame response by the Town to instances of overt racial animus in Town workplaces. These circumstances do not compel the conclusion that the Town officials are racists; I make no such finding with regard to Mr. Peterson and Mr. Fisher, the two defendants who testified in this case. Rather, these facts suggest to me that the black communities, on balance, have been to a significant extent neglected by the Town government, and the political processes by which that might be corrected are not equally open to

---

**30.** *See* Tr. 2041:
The Court: Suppose the Republican Party said no blacks need apply, we don't want blacks in our party. Is it your position [that] as

long as that is not the case with the Democrats, that's sufficient in terms of equal access to overcome [a] Section 2 claim?
[Counsel For Defendants]: Yes, your Honor.

the participation of blacks in the Town—even black Republicans.

The subtle racial appeals in campaign literature distributed by certain Republicans further distanced blacks from Town government. A class of people that is not welcome in the Town itself—and I conclude that this was the subtle message of the campaign literature at issue—cannot fairly be said to have equal access to the Town government. Again, this conclusion should not be overstated: I do not conclude that the people in the Town of Hempstead are racially biased, or that they have resisted the steady integration of the Town. However, the efforts by certain Republicans to arouse (and capitalize on) such sentiments is a significant factor in the totality of the circumstances.

Finally, the policy underlying the Town's continued use of the at-large system is especially tenuous. The Town Supervisor claims that carving the Town into districts is a bad idea because it will cause council members to become "parochial." This view is based on the shaky (to put it mildly) premise that legislators elected at-large in the Town transcend petty political concerns in governing the Town, and simply do the "right thing."

### 1. *The Effect Of Partisan Politics*

Defendants contend that partisan affiliation, not race, best explains the divergent voting patterns among black and white voters in the Town, and that the racially polarized voting thus cannot be "legally significant" within the meaning of *Gingles.* They argue that "in order to rebut proof of partisanship, and in order to establish legally significant racial bloc voting, plaintiffs must prove that the Town's political parties serve as proxies for illegitimate racial bias," an inquiry that "focuses exclusively on *voter* (*i.e.,* resident) behavior." Defendants' Post–Trial Findings Of Fact And Conclusions Of Law at 65–66 (emphasis in original). The "critical question," according to defendants, is whether the white bloc voting "arises from racial bias in the community rather than from partisan politics." *Id.* at 59–60, 106 S.Ct. at 2770–71; see also Tr. 2074. If plaintiffs cannot prove that such bias infects the voting community, defendants contend, the

Section 2 claim must fail. In support of this argument, defendants cite *Nipper v. Smith,* 39 F.3d 1494 (11th Cir.1994) (en banc), *cert. denied,* —— U.S. ——, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995); *League of United Latin American Citizens v. Clements,* 999 F.2d 831 (5th Cir.1993), *cert. denied,* 510 U.S. 1071, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994); and *Reed v. Town of Babylon,* 914 F.Supp. 843 (E.D.N.Y.1996).

■ I disagree. I conclude that neither the existence (or non-existence) of racial bias in the community nor the strength of the correlation between partisan politics and divergent voting patterns can be dispositive in a Section 2 case. Rather, they are simply among the many factors to be considered in determining whether, under the totality of the circumstances, an at-large scheme has impaired the ability of black voters in the Town to participate equally in Town Board elections.

There was disagreement among the Justices of the Supreme Court in *Gingles* over whether the causes of white bloc voting are relevant at all in a Section 2 case. Justice Brennan, joined by three other justices, stated that legally significant white bloc voting "means simply that the race of voters correlates with the selection of a certain candidate or candidates; that is, it refers to the situation where different races ... vote in blocs for different candidates." *Gingles,* 478 U.S. at 62, 106 S.Ct. at 2772. According to Justice Brennan's opinion, the *reasons* black and white voters vote differently have no relevance to the central inquiry of § 2. *Id.* at 62, 106 S.Ct. at 2772. Rather,

> [T]he critical question in a § 2 claim is whether the use of a contested electoral practice or structure results in members of a protected group having less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

> \*　　\*　　\*　　\*　　\*　　\*

> It is the *difference* between the choices made by blacks and whites—not the reasons for that difference—that results in blacks having less opportunity than whites to elect their preferred representatives.

Consequently, we conclude that under the "results test" of § 2, only the correlation between race of voter and selection of certain candidates, not the causes of the correlation, matters.

\* \* \* \* \* \*

Focusing on the discriminatory intent of the voters, rather than the behavior of voters ... asks the wrong question. All that matters under § 2 and under a functional theory of vote dilution is voter behavior, not its explanations. Moreover, as we have explained in detail ... requiring proof that racial considerations actually *caused* voter behavior will result—contrary to congressional intent—in situations where a black minority that functionally has been totally excluded from the political process will be unable to establish a § 2 violation.

*Id.* at 63, 73, 106 S.Ct. at 2773, 2778 (emphasis in original).

Five justices in *Gingles* did not join in this section of Justice Brennan's opinion, and Justices White and O'Connor wrote separate opinions on the subject. Justice White rejected the notion that the race of the *candidates* is irrelevant. He wrote that Section 2 cannot properly be invoked where black candidates were being elected as Republicans but defeated as minority-preferred Democrats, as "[t]his is interest-group politics rather than a rule hedging against racial discrimination." *Gingles,* 478 U.S. at 83, 106 S.Ct. at 2783.

Justice O'Connor, joined by Chief Justice Burger and Justices Powell and Rehnquist, wrote that Justice Brennan's test for vote dilution came too close to granting a right to proportional representation, in violation of Congress's intent and explicit statement in § 2 that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." Justice O'Connor explained that the 1982 amendment was a legislative compromise: plaintiffs were freed of the burden of proving discriminatory purposes, and could proceed by establishing "discriminatory results;" but a pure "results" test, *i.e.,* proportional representation, was explicitly rejected. *Id.* at 84, 106 S.Ct.

at 2783–84. Construing this compromise legislation "is not an easy task." *Id. See also Baird v. Consolidated City of Indianapolis,* 976 F.2d 357, 359 (7th Cir.1992), *cert. denied,* 508 U.S. 907, 113 S.Ct. 2334, 124 L.Ed.2d 246 (1993) ("Any compromise that seeks to have things both ways, as this one did, produces nightmares in implementation.") Accordingly, Justice O'Connor concluded that it is indeed relevant to the "overall vote dilution inquiry" that divergent racial voting patterns may be explained by causes other than race. 478 U.S. at 100, 106 S.Ct. at 2792. She wrote:

Evidence that a candidate preferred by the minority group in a particular election was rejected by white voters for reasons other than those which made that candidate the preferred choice of the minority group would seem clearly relevant in answering the question whether bloc voting by white voters will consistently defeat minority candidates. Such evidence would suggest that another candidate, equally preferred by the minority group, might be able to attract greater white support in future elections.

I believe Congress also intended that explanations of the reasons why white voters rejected minority candidates would be probative of the likelihood that candidates elected without decisive minority support would be willing to take the minority's interest into account. In a community that is polarized along racial lines, racial hostility may bar these and other indirect avenues of political influence to a much greater extent than in a community where racial animosity is absent although the interests of racial groups diverge. Indeed, the Senate Report clearly stated that one factor that could have probative value in § 2 cases was "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." S.Rep., at 29, U.S.Code Cong. & Admin.News 1982, p. 207. The overall vote dilution inquiry neither requires nor permits an arbitrary rule against consideration of all evidence concerning voting

preferences other than statistical evidence of racial voting patterns.

*Id.* at 100–01, 106 S.Ct. at 2792. Justice O'Connor concluded as follows:

> [T]he evaluation of an alleged impairment of voting strength requires consideration of the minority group's access to the political process generally, not solely consideration of the chances that its preferred candidates will actually be elected. Proof that white voters withhold their support from minority-preferred candidates to an extent that consistently ensures their defeat is entitled to significant weight in plaintiffs' favor. However, if plaintiffs direct their proof solely towards the minority group's prospects for electoral success, they must show that substantial minority success will be highly infrequent under the challenged plan in order to establish that the plan operates to cancel out or minimize their voting strength.

*Id.* at 105, 106 S.Ct. at 2794–95 (citations and internal quotation marks omitted).

I agree with the defendants that a careful reading of the opinions in *Gingles* warrants the conclusion that the causes for white bloc voting must be considered. Although I find this issue to be irrelevant to the inquiry into the three *Gingles* preconditions, it is properly included as one of the factors to be considered in the totality of the circumstances inquiry. *Lewis v. Alamance County, N.C.*, 99 F.3d 600, 615 n. 12 (4th Cir.1996), *see also* Comment, *Straight Party Tickets and Redistricting Thickets: Nonracial Motivations for Voter Preferences*, 1995 U.Chi.Legal F. 505, 512 (1995).

In this case, it weighs in favor of the defendants. They presented evidence that Democratic candidates for Town Board, whether black or white, receive essentially equal levels of support, and always lose. Similarly, the one black Republican candidate for Town Board, Curtis Fisher in 1993, received essentially the same support from white voters as did the white Republican candidates. The significance of the Fisher election is blunted, if not erased, by the special circumstance of incumbency (he had

been appointed to the position prior to the 1993 election), as that status has proved to be a guarantee of success in Town Board elections. Nevertheless, I conclude that there is a strong correlation between political partisanship and the voting behavior of blacks and whites in the Town.

However, the fact that divergent voting patterns may logically be explained by a factor other than race does not end the inquiry, nor does it require plaintiffs to prove racial bias in the community or that political parties in the Town serve as "proxies" for racism. The relevant factors here are not mutually exclusive. It is possible for race-neutral factors, such as political partisanship, to co-exist with race-based ones, such as diminished access to the slating process or insensitivity by elected officials to the particularized needs of the minority community. Thus, "even if [proof of a race-neutral cause of divergent voting patterns] is forthcoming, the defendant does not automatically triumph. Instead, the court must determine whether, based on the totality of the circumstances ..., the plaintiffs have proven that the minority group was denied meaningful access to the political system on account of race." *Uno v. City of Holyoke*, 72 F.3d 973, 983 (1st Cir.1995).

In evaluating all of the relevant facts as a whole, including the size of the Town, the absence of geographic subdistricts, the lack of access by blacks to the Republican Party slating process, the unfortunate use of racial appeals in political campaigns, the lack of responsiveness by the Town Board to the particularized needs of the black communities, and the stated desire by the Town government to cling to a monolithic, single-voice legislature for a heterogeneous population consisting of many different communities and voices, I conclude that black citizens' failure to elect representatives of their choice to the Town Board is not best explained by partisan politics. Rather, black citizens' inability to elect their preferred candidates is best explained by the fact that the political processes leading to elections and the slating of candidates for them are not equally open to the participation of blacks.[31]

---

**31.** Defendants rely especially heavily on *Baird v.*

*Consolidated City of Indianapolis*, 976 F.2d 357

## CONCLUSION

African–Americans in the Town of Hempstead have no right to be represented on the Town Board. They have no right to be protected from political defeat at the polls, even if that defeat is total and persists for decades. African–Americans do have a right, however, which is protected by Section 2 of the Voting Rights Act of 1965, to an even playing field. They have a right to be given a fair shake by the political processes leading to nominations and elections to the Town Board.

Determining whether an at-large election scheme violates that right requires "an intensely local appraisal" of the impact such a scheme has "in the light of past and present reality, political and otherwise." *White v. Regester*, 412 U.S. 755, 769–70, 93 S.Ct. 2332, 2341, 37 L.Ed.2d 314 (1973). Having conducted the careful and searching appraisal mandated by Section 2, I have a definite and firm conviction that the at-large scheme employed for Town Board elections in Hempstead has operated to invidiously exclude blacks from effective participation in political life in violation of Section 2.

Accordingly, the Town Board is hereby ordered to submit to the Court a remedial plan that divides the Town into six single-member districts. The schedule for the submission of the proposed plan, and for objections thereto, shall be the subject of a status conference to be held on February 27, 1997 at 9:30 a.m.

So Ordered.

---

(7th Cir.1992), which they claim is virtually identical to this case. The vote dilution claim in *Baird* challenged four at-large seats in a 29–member City–County Council. The other twenty-five seats were elected from single-member districts, of which seven were majority-minority. Plaintiffs conceded that the single member districts complied with Section 2 because they gave black voters, who comprised 19.28% of the voting population, control over 24.14% of the seats in the legislature. They nevertheless challenged the four at-large seats on the ground that four large single-member districts could be drawn in such a way that blacks would constitute a majority in one of them. 976 F.2d at 358. The district court had granted summary judgment for defendants, and the Seventh Circuit affirmed.

The Seventh Circuit observed "that losses by the candidates black voters prefer may have more to do with politics than race." *Id.* at 361. The court observed that Marion County was a "Republican stronghold" in which voters "seem to prefer Republicans but do not necessarily judge their Republicans by color." *Id.* Indeed, although the Republicans had won all four at-large seats by comfortable margins, one of the four victors in the 1991 elections was black. Citing the opinions of Justice White and Justice O'Connor in *Gingles*, the Seventh Circuit found the election of a black Republican relevant to the question whether the black voters' right to vote had been abridged "on account of race or color," as required by Section 2. *Id.*

Defendants' reliance on the similarities between this case and *Baird* (the Republican dominance, the strong correlation between partisanship and voter behavior, the election of a black Republican) overlooks a critical difference. The hybrid legislature at issue in *Baird*, with its seven single-member minority-dominated districts, gave the black voters proportional representation. Section 2 requires a showing that, under the totality of the circumstances, the challenged electoral practice results in unequal access, and the Seventh Circuit held that "[t]he 'totality of the circumstances' in this case *guarantee* black voters control over at least seven seats in the Council." *Id.* at 362 (emphasis added). In the Town of Hempstead, the candidates of choice of the black voters have never been elected even once, let alone in numbers (and from districts) that guarantee significant representation.

Moreover, defendants' reliance on *Baird's* holding that proof of the three *Gingles* factors is "not enough" ignores the caveat: it is "not enough ... if other considerations show that the minority has an undiminished right to participate in the political process." 976 F.2d at 359; *see also Johnson v. DeGrandy*, 512 U.S. at 1012 n. 10, 114 S.Ct. at 2657 n. 10. As set forth above, there is no such undiminished right to participation here.

Town of Hemstead
Villages, CDPs,
Non-Hispanic Blacks and Districts

KEY
☐ Town Boundary
☐ Village or CDP
District Boundary

Non-Hispanic Black
■ 80% to 100%
■ 75% to 80%
▨ 50% to 75%
░ 25% to 50%
░ 10% to 25%
☐ 0% to 10%

A - 1

358

Town of Hempstead
18th Assembly District and
Proposed District 3

KEY
☐ Town Boundary
☐ 18th Assembly District
District 3

Miles
0 .5 1 1.5 2 2.5

A - 2